The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw an eye and give their attention. For the Court is now sitting. God save the United States and its Honorable Court. Thank you. You can be seated. All right, Mr. Learberg, did I say that right? Close enough. Whenever you're ready. May it please the Court, Matt Learberg for the appellants, Clear Technology and Versada Enterprises. This case hinges on whether a business can pick up an eight-year-old's for licensing contract and trust that it means what it says. The District Court rewrote just such a contract here and gave Farm Bureau a form of relief that's not contemplated by the contracts themselves. Now, the decision of the District Court should be reversed for two principal reasons today. First, order number two on its face characterizes these $20,000 per month payments as a license fee. And there's no dispute, and Farm Bureau doesn't dispute, that a license fee must be paid in order to keep the license. Secondly... A combination of a license fee and maintenance fee. Your Honor, in this case, there's a maintenance fee that's included. Right. So on order number two, indeed, the annual maintenance fee is listed as included. And Your Honor hits upon the exact crux of this case, which is that this fee, there is contemporaneous evidence that calls it both a license fee and a lowercase m, maintenance fee. There seems to be no dispute that, in fact, that was the business model of Clear Technology at the time. It was to take what used to be treated as recurring maintenance fees that were optional and cancelable at will, and to make them license fees under that term as it's defined under the contracts, which then can't be canceled at will. Even if the customer was no longer interested in maintenance? That's right, Your Honor. In fact, that was the deliberate intent of the business at the time. That was the change in the business model as testified to by Jeff Smith, the Vice President of Marketing, who worked for Versailles and Clear Tech at that time. The idea was to take these fees that instead were optional and to make them license fees. And there's no dispute that a license fee must be paid. If it's not paid, then the license can be terminated and the license doesn't survive the termination of the contract, and therefore that license fee essentially becomes mandatory and is a revenue stream that that business can count on going forward. There's no dispute as to how license fees and annual maintenance fees work under the master agreement. All the parties understand that there's really only two kinds of fees under that agreement. A fee is either a license fee, as that term's defined, which again is mandatory, or an annual maintenance fee, as that term is defined, which is optional. The problem here is that the district court allowed Farm Bureau to create an entirely new kind of fee, a cancelable fee that's not annual, that's a monthly fee. But it did so on the premise that under Colorado law, it could conditionally admit evidence to determine whether or not there was an ambiguity with respect to the contract. And what I'm having trouble deciphering is when is that permissible, when is it not? It seems that under Colorado law, the judge has ample discretion to allow that, and if you allow that, then it appears that the extraneous evidence suggests otherwise. It suggests a result contrary to your position. Your Honor, you're absolutely right that Colorado law is different than most states because it has moved slightly away from the four corners rule that if a document appears unambiguous on its face, that it must be enforced. There's a slight exception to it under Colorado law, as Your Honor states. The exception is this. Which post-states the case cited by Farm Bureau. There can be some extrinsic evidence that can peek in at that first stage of the analysis to inform whether or not there's an ambiguity. But, and this is important, the court said the purpose of that kind of extrinsic evidence is to, quote, consider context and surrounding circumstances. So context and surrounding circumstances in this case would be, for example, what Jeff Smith testified to as to what the model that Clear Tech was using at the time. That's a surrounding circumstance. Also, the expert testimony from Tobin that was offered and uncontradicted by Clear Tech that what do these words mean in the custom and usage? That kind of custom and usage testimony is useful. And a look at these Colorado cases helps explain that. We found three cases where Colorado's used this, the Supreme Court of Colorado's used this kind of outside the four corners rule. The first cited by Farm Bureau is the Eastridge case. And this is a case where they're construing an ancient document. It's 100 years old, and it's a deed. And the question is, what did that deed mean 100 years ago? That's a case where extrinsic evidence as to what those words mean makes sense. And the other cases are an easement case and a deed case as well. There it might matter if how the parties treated this easement over the 10 or 20 years that it had been in existence. That's where a peek at extrinsic evidence makes sense. But in this case, the Fort Lyon court in Colorado said, very specifically, even though you can understand whether there's an amity, there's something you can't do. And that is this. A court may not, the court has always made clear that, quote, extrinsic evidence of intent can never contradict or change the language of a contract or justify an interpretation not reasonably derivable from the contract itself. That's where Farm Bureau's argument runs afoul here. Farm Bureau wants to look at expressions of intent that were created eight years after the fact and use them to unseat the plain language of the contract and the plain language of the extrinsic evidence that really matters, which is the contemporaneous e-mail communications. There's no reason for this court to credit these eight-year post-hoc guesses at what the parties meant at the time when the contract speaks for itself. And if the court's inclined to peek at extrinsic evidence, the contemporaneous e-mail sent by John Kendall at the time says twice that this $20,000 a month fee is a license fee. But then it has the e-mail also included in parentheses maintenance, doesn't it? It does. And that Farm Bureau has hung its hat on that exact parentheses, those two words in parentheses. But looked at the uncontradicted, looked against the backdrop of the uncontradicted evidence in this case, that supports Cleartech's theory. But that is the contradiction. That's part of the contradiction. What's in the parentheses? The only, Judge Avis, the only reason there would be a perception of a contradiction is if it has to be either maintenance or license. You're absolutely right. If it has to be one or the other, then yes, there could be a problem. But the issue here is that it's undisputed that Cleartech was using maintenance-type fees like this, lowercase m, maintenance fees, and making them license fees, as that term is defined under the contract, so that they wouldn't be cancelable. That's what Jeff Smith testified to. That's uncontradicted. And that is normal in the industry as testified by the uncontradicted expert testimony of Mr. Tobin. How does that demonstrate that that was the customer's perception of what the contract is? Your Honor, the customer probably did believe it was for maintenance. But there's nothing. And it was ambiguous. Not necessarily, Your Honor. It can be for maintenance and be a license fee at the same time. The problem, the distinction is this. There's something called the annual maintenance fee. That's a defined term, right, under the contract. No one, even Farm Bureau, none of their witnesses has ever said that a $20,000 a month fee can be an annual maintenance fee. It just doesn't fit into that box because it's not annual, and it was never called an annual maintenance fee. It was listed as a license fee on Order No. 2. So this fee, that, yes, it may be both for maintenance and a license fee at the same time, but there's no evidence. And, in fact, none of their witnesses ever said that they understood in 2004 that that fee was optional and that if they stopped paying it, they could keep the license. I suppose it would help me. I've listened carefully. You have alternative requests before us. You either want judgment rendered for your client or, you say in the alternative, remand for trial. Which do you really want? The former, Your Honor. Absolutely. I'm not surprised by your answer. But which would you really think this court is most likely to give you? Your Honor, with respect, I still think the former, and the reason— I wouldn't have asked the question if— You probably know what I'm going to say. The reason is because this contract, there's nothing— if you pick up this contract as a reader who understands the IP software industry, there is nothing in it that says to an objective reader that there's a problem or an ambiguity here. There's nothing. Now, assuming there's an ambiguity, then what's the outcome here? So, Your Honor, if there's an ambiguity, then, of course, this court can look at this extrinsic evidence. And we would contend that what is the extrinsic evidence that's really valuable here? Three things. First— Well, when you say valuable, I'm not sure how to—what do you mean by that? Oh, Your Honor, the extrinsic evidence that's most probative. In fact, this court said—there's a great quote from this court from an old case from 1972 that said, contemporaneous witness statements or communications are these unique catalysts in the search for truth. So we would contend that those contemporaneous emails that characterize this as a license fee and maintenance fee, that those are much more valuable and probative than deposition testimony that came eight years later from employees who are no longer with the company. So valuable that even after assessing an ambiguity, you'd still be entitled to judgment as a matter of law, or is the more reasonable remedy a trial for jury? Judge Diaz, it's certainly true that if there were any contradiction in the evidence here, then yes. Obviously, if there's an issue of material fact, then a trial is appropriate. But we think that because there's expert testimony that's uncontradicted here, that's what makes us entitled to—even in the ambiguity situation—entitled to judgment as a matter of law. And that's because of this. Formbier had every opportunity to find an expert who could explain why a contract, a perpetual license that's subject to various terms and conditions in the contract, why that in some cases that's cancelable and revocable and why in some cases it's not. But why would we value the testimony of an expert over those who were actually negotiating the contract once you get over the ambiguity hurdle? Your Honor, you're absolutely right. The expert isn't the first stop. The first stop is their contemporaneous characterization of it by saying this is a for-maintenance license fee. That is both. But what about the testimony of your former employee? The testimony eight years later, it's actually not 100% inconsistent with our theory, and here's why. The testimony from the deposition says, these employees say, you know, we meant this to be a maintenance fee, a lowercase m maintenance fee. It was for maintenance. But that's our theory too. This, in fact, was maintenance fees. These had historically been maintenance fees. Did they also say it was optional? No. Your Honor, I reread the record, and I can't find where in the record any witness said in the depositions that they believed in 2004 that this was optional. Is there a reasonable inference from the record? No, Your Honor, not necessarily, and here's why. The problem is, under the master agreement, there's absolutely a characterization of annual maintenance fees as essentially optional. It doesn't use the word optional. It says that you have to pay it, but if you don't, the only consequence is you don't get the maintenance. So that's essentially optional, right? Right. But there's no discussion of any other category of maintenance fee. What the district court did here is took this $20,000 thing called a license fee on the face of Order No. 2, said it wasn't a license fee, that instead it was a maintenance fee, and then here's the part that there's no support for. The judge took that $20,000 lowercase m maintenance fee and gave Farm Bureau the relief that it can only have if it's an annual maintenance fee under the master. Which a jury could reasonably so find, couldn't it? A jury may find that a $20,000 monthly fee is an annual fee. That would be a little bit of a stretch because it can't be both monthly and annual at the same time. The question is whether it's cancelable. The question is whether it's cancelable. What happens? The contracts don't say, and none of the witnesses say, what happens if a third category of payment was created here, right? Not an annual maintenance fee and not a license fee. What do you do with it? Is it optional? Is it required? What happens if you don't pay it? Because the master agreement only speaks to two kinds of fees, if the district court or a jury is inclined to create a whole new category of fee, there's nothing in paper that says what happens, and there's nothing in the depositions that say what happens if you stop paying it. That's why a jury would need to consider the evidence bearing on the party's intent. Your Honor, if we're in that situation, then you're completely right. This has to go to a jury. At the very least, there's just nothing in this 800 pages that I've been able to find that says what the party's meant to happen if this third category of fee was created. And you don't mean to suggest I don't think that expert opinion testimony is necessary for either party to sustain a burden on that issue. And by the way, who has the burden here? Burden approved. That's a good question, Your Honor. I try to ask good questions, you know. I don't always succeed, but you drafted it. There's no dispute that this is a draft. So you have a burden here, right? Well, the burden is on the plaintiff to meet their declaratory judgment, but Your Honor's right, under Colorado law. But Colorado law shifts that burden, doesn't it? In a sense, in the sense that it's construed against the drafters. You're absolutely right, Your Honor. And so to the extent there's an ambiguity, but we still contend there isn't, but if there were, then yes, definitely that burden is shifted to us when it comes to that time at trial. But the problem here is that there's just no way to probe what the party is meant to do with this third kind of fee, if indeed that's what it is. We still think we should just read the contracts as they say, and that somebody like Rosada coming along and buying a company and purchasing and doing their due diligence on the contract should be able to pick them up, look at the face of order number two, see that it's a license fee, look at the master agreement, see what happens when a license fee is not paid, namely termination, find the merger clause where the parties absolutely said, by any token, we don't want to be in court ten years from now litigating this question. That's what the merger clause says. And then have any question that they would have to call one of the former principals who lives in Mexico and find out what he thought he meant when he signed it. But these agreements have arbitration clauses now, don't they? I don't know what they say now, Your Honor. And I'd like to reserve the rest of my time for rebuttal. Thank you. Mr. Brock. Thank you, Your Honor. Walter Brock from the Wake County Bar. I'm privileged to represent North Carolina Farm Bureau. Here providing me with moral support is my partner, Bob DeRosette, who was also with me on the brief. And I think if one steps back and looks at what you have heard the argument from Versada is, it's an entirely new rule of contract construction. It's a rule that we're the subsequently acquiring company, and we are entitled to the expectations of a revenue stream that we have from acquiring this company. They don't provide any evidence to us. The record is devoid of any evidence as to whether there was any due diligence at all in analyzing any of these contracts, much less order number two. But they would like us to assume, it's just the assumption that in acquiring this, that Versada assumed that they were entitled to a license fee in perpetuity for providing nothing. It's assumed that because they say we now read this as providing for a $20,000 per month ongoing license fee that cannot ever be stopped, even if you stop providing maintenance. So I submit to you what we have here is the classic situation. When you look at the form of the order and the vertical and horizontal placement of the payment terms, and then the argument that we hear today, it is absolutely form over substance. Chuck, you said that they would be entitled to the fee even if they stopped performing maintenance. That's their contention. Well, no, I think they're required to provide it. Whether you're required to accept it is a whole different question. But I would think that if they stopped providing maintenance under this agreement, under order number two, your client would be entitled to sue for breach of contract. Their own expert, who they say is uncontradicted, says there's no remedy for Farm Bureau. That if Versada were to decide to stop providing maintenance, there is no remedy. He says there's no right to maintain. That may be his view of the contract, but I don't think that would be dispositive. I think what we have to do is look at what Versada is really arguing, and we look at it, and what they're trying to do is take in isolation the form of the cover page on order number two. And I heard now a new argument that there is a third category of fees, and I've heard the argument this morning that they had a right to change their business model so that they would have a combined payment of maintenance fees and license fees so they could create an unlimited stream of revenue. But here's the problem with that. That's not what the master agreement says. The master agreement clearly provides that there are only two kinds of fees, and that's where their argument totally breaks down. There are only two kinds of fees. There are license fees, and there are maintenance fees. And if you read the agreement, it says the license fee. It doesn't presume fees are ongoing payments. The order number two is subject to the master agreement, not vice versa. There is no addendum to the master agreement to create this third category of payment, which they've characterized as a license fee that includes maintenance. That's where the ambiguity arises. There is no such thing, and they have suggested that we can go back and try a case about this third category of fee and let the jury sift that out. Well, that's nonsense. There is no such third category of fee. There are two categories of fees. There's a license fee that grants a perpetual license, and then there is a maintenance fee. There's an annual maintenance fee. That's true. There is an annual maintenance fee, but that's the only kind of maintenance fee. And certainly nobody can come back now after we've been litigating this for several years and say this order form could not be clearer. We are here to concede that. But it's simply a spreading of the $240,000 payment for annual fees over 12 months. There's nothing magic about that. The origins of this dispute started with their failing to provide the maintenance and support that Farm Bureau wanted and accepted after the company was acquired by Versada. And what happened? They offshored the support and maintenance. They eliminated the consultants that Farm Bureau had been relying upon. They weren't completing work requirements to correct some of the software problems. And they also advised Farm Bureau that they're not going to support at all the primary software platform that they relied on to run the transact software, something they call 3.X, whatever that means. And so therein started the problem right there. They weren't going to provide that support. They announced that they were going to terminate the support. They call it expired support. Well, there's nothing in the license agreement, the master agreement that allows the license to expire. That doesn't exist. You can't terminate the license except for a breach of the agreement. So what's expiring? What's expiring is maintenance and service. And when the maintenance and service expired, and they were announcing it's expiring as of August of 2011, they had a right under their agreement to stop providing maintenance for a non-current version of the transact software. But then when we said, okay, if you're not going to provide that service, then we're just not going to be making our monthly service payments, they all of a sudden step back, uh-oh, there goes our stream of revenue. There's no evidence that they ever go inquire as to what that $20,000 really meant. There is no such thing as a combined license and maintenance fee. The only thing that the master agreement could possibly recognize with a recurrent ongoing payment is a maintenance and support fee. And so what do they do? Even though it's contrary to their own notifications that your maintenance and support is going to expire, they come in and write a letter. Well, if you stop making your maintenance and support payments, then your license will be terminated. And that's the first thing to happen. That's in August of 2011. And Farm Bureau said, wait just a minute. And they want to propose to them a new software. Let's start all over kind of software. Farm Bureau said, we're not interested in that. We don't like your proposal. They rejected that proposal. Interesting, look at the proposal. Look at the proposal. It's in the joint appendix on page 311. It starts talking about your very expensive maintenance fees and expenses, very expensive maintenance program. We can help you with that. We'll fix everything for you. We're going to come and buy our new software, but that new software is not existent. It doesn't really exist yet. It hasn't been created. What they call in the software business is paperware. But that's why Farm Bureau decided we're not going there. We're going to sunset use of Transact because we're moving to another whole platform. So we don't need your maintenance and support anyway. If you're not going to do a good job, we just don't want to pay for it. And so therein is dispute. The dispute, interestingly, is not between the parties who negotiated the contract. That's the unique thing about this case. The dispute is not between the parties who negotiated the contract. The dispute is between Versada that bought this company, assuming a stream of commerce, a stream of revenue, based on what? We don't know. Was it based on a review of the contract? It couldn't have been based on a review of the order form and the master agreement because they don't reconcile. There's no such thing as a combined payment for a license and revenue. So what were they relying on? We don't know. We do know if there would have been good evidence as to what they were relying on and that they did have a specific review of order number two and the master agreement and that review indicated that we have a perpetual license fee, then we would have seen that in the record and it's not there. So what we have is a post hoc interpretation by somebody who wasn't even a party to the agreement to tell us arrogantly what our agreement was. Where in the history of contract interpretation has a court had the benefit of actually not only seeing the contemporaneous writings of the parties who signed the contract but having their agreed testimony as to exactly what the contract meant and that each and every one of them say and is not contradicted by anything except the ambiguous layout both horizontally and vertically of the payment terms in the order. There's no disagreement that $300,000 was a one-time upfront lump sum license fee for a perpetual license and that there was a $20,000 per month payment for maintenance, ongoing maintenance of the system. That's a large chunk of money. I can see why they would spread it out for 12 months and not be one. The testimony is not that it was cancelable at will. The testimony doesn't go to that. But there was this question, Your Honor. There was this question to each of the deponents. What part of the $20,000 was for maintenance? I know you all poured through the record and you've read that and you know what the answer was. The answer was none. None of the $20,000. I'm sorry, I misspoke. For license. How much of the $20,000 was for license fee? And the answer by each of the witnesses was none. And nobody followed up by saying, and could that be canceled at will? Well, I don't think you have to do that, Your Honor, because if you are governed by the master agreement, it says that. The master agreement defines. Annual maintenance. Annual maintenance. It does say annual maintenance. I can't get away from that. I can't run from that. As one of the witnesses said, if we'd known anybody was going to question what our deal was, and we'd have had a third party looking at it and flashing back, maybe we'd have written it differently. But we still see the payment terms just as we agreed to, right there on the face of that order. We agreed to $300,000 up front licensing fee. We agreed to $20,000 per month maintenance, and it's right there. It's right there on the form, so we never looked at it again. Including order number two, apparently. They didn't question it. They knew what the deal was. And I will submit to you that the question becomes, okay, is there an ambiguity? And there has to be an ambiguity, because there's not this third form of a fee that Versada would like to argue that there is. There isn't one. Order number two is governed by the terms of the master agreement, which provide that if you pay a license fee, you get a perpetual license. And then you have periodic support and maintenance fees. And if we want to apply the fundamental principles of contract interpretation, you want to reconcile that. You want to give all of the provisions of the contract, meaning if you accept their version of the contract, the whole issue about the maintenance provisions are out. They're not there anymore. They don't provide it. You don't have a right to discontinue it. It's just basically written out of the agreement. So we believe that what you have to do, now you obviously have an agreement that is ambiguous on its face, because there is no such thing as a combined license maintenance fee. I'm a little curious. This is not particularly germane, I guess, but why did your client choose to pay under protest instead of just seize the payment? Abundance of caution, Your Honor. Just being cautious. It runs our whole underwriting process. I certainly wasn't going to write them a guarantee, Your Honor. We certainly believe strongly in our case, but I haven't yet written a guarantee, and I've been at this a few years. So caution, I think, is the appropriate course of action, and what we did is we asked the court to declare what the rights of the parties were and continued paying until the district court ruled that there was no obligation to continue paying that because they weren't providing any support and maintenance. So have you stopped paying now? Only since the district court issued this order, and there was no stay, salt of the district court's order. And so we've proceeded that way. And there's been a bond put up by Versada for the award of back payments that were awarded by the district court. So the next question, okay, we have good questions up here about, okay, well, if we have an ambiguous agreement, then what does the record tell the court that we need to do with it? The district court looked at the record and I think correctly said, well, there is no contradictory evidence. Once you consider extrinsic evidence, there is no contradictory evidence as to what the intent of the parties was. And there isn't any. It is sort of humorous to hear counsel for Versada keep arguing that the email says what they contend. Well, it absolutely doesn't, and it's plain as day. It's plain as the nose on our faces. It says maintenance, the $20,000 per month for maintenance. I mean, that's plain English language. That couldn't be any clearer. That's what the parties did throughout the operation of the agreement. They operated under that understanding that that's what that $20,000 payment was. So what do we do? What is that extrinsic evidence? Well, the extrinsic evidence includes that email that clearly says that the $20,000 per month for maintenance. Then you look at. Well, it says $20,000 license fee for maintenance. No, it does not. No, it does not. It says $300,000 license fee. No, it says $300,000, plus $20,000 per month for maintenance. For the license. It's on the joint appendix, page 86 and 87. It says. It's quote is $300,000 comma, plus $20,000 per month per in for maintenance. Close brand input. It doesn't say $300,000 for license. No, no, no. It says $300,000 plus $20,000 per month per in for maintenance for the license. It does. Oh, yeah, at the end of the sentence. That's true. And it's also under the caption of license fee. It is, but there's no caption for maintenance either. But they say it's for maintenance. So I submit. I guess, you know, looking at the documents, there's an ambiguity here. If we were relying solely on the documents, I think this clearly would be an issue for trial. If you're saying that the best evidence of the party's intent is the deposition testimony of the former employee. And it's uncontradicted. Okay. What is there to try? I've asked myself, and we've talked with my partner, Bob Derricette, about it. Okay, what if the court thinks there's an ambiguity? Typically, when the court says there's an ambiguity, typically the court will say there are issues of fact for trial. And we recognize that. That's typically what happens. But the cases say typically or generally. Here, just looking at it, if we were directed verdict stage, what evidence is there other than the testimony of the very parties who signed the agreement? And they want to – Versada wants to talk about it as the former employees, where they're not the former employees. It's the former founder and president and the former CFO all agree, down to the letter with Linda Squires, the representative of Farm Bureau, and Chris Kendall and Linda Squires signed the agreement. We've looked and looked. I've never found a case where a court said, we don't care what the parties say they agreed to. Courts say that all the time. Courts say that all the time. Not when the objective test. Well, I think that's a really good point. And what I'd like to do is perhaps conclude on that, Judge Davis. The universal goal of the courts, and I don't have to lecture this to this court, is to ascertain the intent of the parties. That's the universal goal here. The rules of construction that the courts come up with are developed in common law as tools to achieve that intent, but not to defeat it. Versada's argument, again, explicitly and implicitly, says what you're most interested in is what the expectations of this acquiring company was four years after the contract was entered into. I submit it's a superficial analysis. It only looks at the face of the order, which we acknowledge is confusing. But it's a classic. I mean, it's the epitome of form over substance, the vertical and horizontal placement of the payment terms on that. And I'll submit to you it's a little bit of also a dose of wishful thinking. They wish they had an unlimited stream of income without providing the support and maintenance that was essential to the deal to begin with. I submit that if you follow those rules and you harmonize all the terms of the agreements, then you will find that what we have here is exactly what the parties testified to. We have a $300,000 license fee for a perpetual license, and we have $20,000 per month payment for maintenance. And we believe that the decision of the district court should be affirmed. There are no material issues of fact once you look at the extraneous evidence and the testimony of the parties who signed the agreement. Okay, thank you. Thank you. Let's hear from Mr. Learberg. Your Honor, Farm Bureau has said there's only two kinds of fees, and we couldn't agree more. There's a license fee and an annual maintenance fee. There's only two under the master agreement. Now, Linda Squires, who was one of the 30B6 deponents for Farm Bureau, testified. She was asked, well, can a license fee be a one-time payment? Yes. Can a license fee be monthly? And she said yes. This is on the record in page 2. 282. She conceded that there's no reason a license fee can't be a mix of monthly or one-time payment or yearly or anything. There's no temporal element, I believe she says, or something along those lines. So we would say yes, these contracts show that there's no need for a third category of fee. I mean, our principal position is order number two calls for the license fee. It's a license fee. Everybody agrees what happens with the license fee. You have to pay it for the license to continue. But the contemporaneous email that Judge Diaz had a colloquy about, it does, in fact, call it a license fee twice. That's on page 87 of the record. Yes, it mentions that it's for maintenance, and there's a reason for that. There was an intentional bundling of the maintenance with the license fee. It doesn't need to be a third category of fee. It's annual maintenance fee included, it says, on order number two. So this is a $20,000 license fee with maintenance included. No longer optional, at least not from your perspective. You have to provide the service. They don't want it. That's one thing. Your Honor, that gets directly to the next point, and you made this point with Farm Bureau. What did Farm Bureau elect to sue on? They essentially went for the home run. They wanted to stop paying it and use this software forever without paying it for free. What they didn't ask for is if they thought they were getting bad service, if they were upset with the outsourcing of maintenance, all of those other things. There's a way to try and get a Remy for that, and that is look at the contract, point out a place that you would contend that Versailles is not providing the service that it promised, and sue for breach of contract, for inability, you know, for the failure to provide those maintenance services, whatever they are. That theory hasn't been developed at all in this case because Farm Bureau didn't sue on a give us our maintenance theory. It did not sue under that breach of contract theory. They could have, maybe, depending on how that case developed, but they never sued on that. Why do you say they get it for free? They paid $300,000. They paid, well, you're right, Your Honor. It's not free. It certainly isn't. There's an open question as to, of course, whether it was intended to be $300,000 plus $20,000 a month forever in perpetuity, which is what the documents say, or whether that $20,000, you know, was supposed to be for something else. But, yes, we would contend that it was structured to be a monthly payment in perpetuity for the continued use. As counsel said, this underlines their whole underwriting process. This is critical for them. That's why they had to pay the $20,000 under protest. If they pulled the plug on the license, their whole underwriting process would fall apart. This is kind of software at the heart of their business. Now, third, Farm Bureau said that the testimony of their witnesses doesn't – But the point of my question was they could have waited until you sued and then, I guess, taken their chance on a TRO or something, right? They could have, Your Honor. That's right. Or I guess you could have pulled the plug without – you couldn't pull the plug. Not if they're paying. Well, I mean, can you stop them from using the software? Do you have a buggable software, a hackable software that you can go in and shut it down? I'll be – this isn't in the record, but this is how I understand it, Your Honor. The way that I understand these software licenses to work is that there's, like, a passcode, and they expire unless a company continues to authorize its use. That's how I understand it to work. Now, Farm Bureau stated today that there's no testimony that goes to this ultimate question, this question of, okay, if this is something new entirely, then what are we supposed to do with it if they stop paying it? And counsel said the testimony doesn't go to that. Now, there was an opportunity for the parties to address what they thought this fee meant, if it's not a license fee. And I'm sure the court knows there's several places in the depositions where they're wrestling with this. And they say, well, you know, it's not really an annual maintenance fee. Like, take 388 and 389 of the Joint Appendix. This is Chris Kendall. He says, well, it can't really be an annual maintenance fee because it's not annual. And we didn't really want it to be a license fee, so, you know, we should have put it in the special terms box. And there's a box on the order form that is for special terms. If the court looks at other orders in this case, they have specific descriptions in the special terms box. And Chris Kendall himself said, well, that's where it should have gone. And there ends up being this testimony that, well, the order forms don't really reflect what we thought they meant. And at the very least, as Judge Davis says, at the very least, that creates a tribal issue on what did the parties mean if this is some third category of fee. I see that my time has expired, so we would ask that the district court be reversed. Thank you. Thank you. We'll come down to Greek Council and then go on to our next case.
judges: William B. Traxler, Jr., Albert Diaz, Andre M. Davis